<span>ADDINGTON v. WILSON.</span>

────────────

ADDINGTON and Others *v.* WILSON and Another.

Where a trial was in progress in the Circuit Court at the expiration of a regular term, the Court was empowered, by the R. S. 1843, to hold over to complete the trial.

A person competent to make a will may disinherit his children, and his motives can not be called in question.

Where children are disinherited by a will, the hardship of the case is of no weight further than as a circumstance tending, in connection with other evidence, to show the insanity or other mental defect of the testator.

A belief in witchcraft is not, of itself, sufficient evidence of the insanity of a testator, to set aside his will.

APPEAL from the *Randolph* Probate Court.

<span>Saturday, May 27.</span>

PERKINS, J.—*John Wilson*, the executor therein named, presented to the *Randolph* Probate Court, in 1849, for probate, the alleged last will and testament of *Francis Stephen*, deceased. *Addington*, and others interested, filed objections. Issues were made, and tried by a jury, and the will decided to be valid. A new trial was denied.

The trial was in progress at the expiration of the regular term of the Court, and the Court held over to complete the trial. There was no error in so doing. R. S. 1843, p. 733, s. 325.

The second objection is, that the evidence does not support the verdict. It is claimed that the testator was insane when he executed the will. It appears that he was an ordinarily prudent, judicious business man, an average farmer, and that he had acquired property; that he had

five children by a wife who was deceased, and with whom he had, for sometime before her death, lived unhappily, and at whose death he expressed joy; that a portion of his children left him awhile before his decease, and before the making of his will, owing, as they asserted, to domestic difficulties, and refused to return. To those children he left nothing by his will. It further appears that the testator believed in withcraft, that his wife had been a witch, and that "at her death, she had left her witch-sticks to her children, or some of them." He complained of having been very badly treated by some of his daughters, as he said he had been by his wife, and he expressed the belief that this bad treatment originated in the fact of their being witches. In short, the testator seems to have differed from men in general in these particulars alone, that he believed in witchcraft, believed that his wife and daughters were witches, and that they practised their infernal arts upon him.

By our law, a person competent to make a will, may entirely disinherit his children if he pleases to do so; nor can his motives for such an act, where it is done, be called in question. The right is absolute to dispose of all of one's property, over and above the portion required to pay debts and expenses. The hardship of the case, therefore, where children are disinherited, is of no weight further than as a circumstance for the consideration of the jury, in connection with the other evidence submitted, tending to show insanity, or other mental defect.

As to the line of conduct pursued by the wife and daughters towards the testator, and that of the testator towards them, the record discloses nothing; and we can not, therefore, judge whether that of the former was such as to justify the latter in believing that they were possessed by evil spirits or not; nor whether that of the latter towards his wife and daughters was such as tended to indicate insanity or not.

The fact, therefore, that the testator believed those members of his family witches, unaccompanied with the grounds for his belief, would furnish an unsatisfactory basis on which to rest a conclusion, for the tenor of the evidence

makes the impression that it was a course of harsh, undutiful treatment of the testator on the part of the disinherited daughters, that occasioned the disherison; and that he attributed that conduct to the fact of their being bewitched. In other words, that the testator disinherited his daughters for bad conduct, not on account of their harboring bad spirits. If the reason he assigned was false, they should have shown it, to destroy the effect the inference drawn from that reason might have with the jury.

The case, then, so far as this Court is at liberty to control its decision, must turn on this simple question. Is a belief in witchcraft evidence of such insanity as disables a person to make a will?

From the visits of the angels to *Lot*, and others of the patriarchs, (without referring to the scenes in the garden of *Eden*), down to this time when the spirits, like *Poe's* stately midnight raven, come gently rapping, rapping at the chamber doors of modern mediums, some of whom are eminent persons, the world, *Pagan, Jewish,* and *Christian*, have, to a greater or less extent, believed in spiritual existences, some being good and some evil, which have maintained a connection with, and manifested their powers through human beings—in the case of the witch of *Endor* to even raising the dead; while scarcely any pretend to be and no one in fact is able to explain the mystery, to unfold the manner of their operations, or lay down the laws governing them. The prevalence of the belief, however, and the authority on which it rests, are sufficiently extensive and respectable to shield any individual indulging it from the charge, if not of weakness, at least of insanity, simply on account of such belief. There might be cases where a belief in witchcraft, as well as in millerism, or the doctrine of predestination, if permitted too constantly to occupy the mind, might have the effect to obscure its perceptions, destroy its balance in regard to the ordinary transactions of life, make the believer, in short, a monomaniac. But the evidence was not such in this case as to make it clear that the jury should have so returned their verdict.

Lord Chief Justice *Hale,* one of the ablest and purest of

May Term, 1854.

the judges that have graced the *English* Bench, sentenced persons to death for the crime of witchcraft, and Lord *Campbell*, speaking of the fact, says:

"I would very readily have pardoned him for an undoubting belief in witchcraft, and I should have considered that this belief detracted little from his character for discernment and humanity. The Holy Scriptures teach us that in some ages of the world, wicked persons, by the agency of evil spirits, were permitted, through means which exceed the ordinary powers of nature, to work mischief to their fellow-creatures.

"These arts, which were said to be much practiced in popish times, were supposed to have become still more common at the reformation. Accordingly, the statute 33 Hen. 8, c. 8, made all witchcraft and sorcery *felony without benefit of clergy*, and by 1 Jac. 1, s. 12, (passed when Lord *Bacon* was a member of the House of Commons) the capital punishment was extended to 'all persons invoking an evil spirit, or consulting, covenanting with, entertaining, employing, *feeding*, or rewarding any evil spirit, or taking up dead bodies from their graves, to be used in any witchcraft, sorcery, charm, or enchantment.'" Lives of the Chief Justices, vol. 1, p. 443.

*Per Curiam.*—The judgment is affirmed with costs.

*J. Morrison*, *B. Mc Clelland*, and *N. B. Hawkins*, for the appellants.

*D. Kilgore*, for the appellee.