EDWARD G. THOMPSON and others, appellants, *vs.* DAVID THOMPSON and others, respondents.

Erroneous, foolish, and even absurd opinions on certain subjects, do not show insanity, when the person entertaining them still continues in the possession of his faculties, discreetly conducting not only his own affairs but the business of others.

Accordingly, where it appeared, from the testimony, that a testator, previous to his death, was perfectly competent to, and did, transact business of a very large extent, for himself and as trustee for others, and as a director of several incorporated institutions; and that, although entertaining many peculiarities of opinion, such peculiarities never disturbed his reason, and did not establish unsoundness of mind, or an inability to manage his own affairs, or to dispose of his property according to the suggestions of his own unbiased and unfettered will; that his false opinions on many topics did not affect his intellect or affections, or render him incapable of disposing of his property in obedience to the free impulses and motives by which the human mind, in its ordinary healthy state, is directed on such occasions; that they did not impair his ability to make prudent investments, or to advise in the affairs of the various companies with which he was connected; or in the least affect or influence his action in relation to the final disposition of his property, or in relation to any of the prior wills which he had executed; that they did not affect his testamentary capacity, in any degree; that he was not subject to any mental aberrations or imbecility that exposed him to undue influence, especially in the disposition of his property; and that no such influence was in fact used; *it was held* that the testator was competent to make a valid will; and he having executed a will and assigned reasons for its provisions which showed a mind sound in its power of reasoning, a decree of the surrogate, admitting the same to probate, was affirmed. CLERKE, J. dissented.

THIS was an appeal from a decree of the surrogate of the county of New York, admitting to probate an instrument propounded as the last will and testament of Abraham G. Thompson, late of the city of New York, as a will of real and personal estate. The will was dated October 27, 1851, and the testator died two days thereafter, aged 75 years. The case before the surrogate is reported in 2 *Bradford's Rep.* 449. The facts are so fully stated there, and in the following opinion of Justice CLERKE, that any further statement here, is unnecessary.

*C. D. Newman, C. O'Conor* and *Wm. Fullerton,* for the appellants. I. The paper offered for probate, is not the will of

the decedent. It is in an inchoate state, in the absence of the schedule referred to in the body of the will, and which was to have been signed and attached thereto, as a part of the instrument. The schedule was to have been signed by the testator. By the omission, an unknown amount of property which was to have been named in the schedule, falls into the residuum of the estate, and contrary to the decedent's wishes, will go to the charitable institutions, if this imperfect paper stands as a testament.

II. Considering the state of the decedent's mind, he was the subject of an undue influence, at the time of the preparation and execution of the will. The undue influence may not have been sufficient of itself to defeat the will, but it becomes important in this case to consider its nature, tendency and effects, in connection with the decedent's insanity. As to the undue influence. (1.) Mrs. Fila Hunt was in a condition to exert an undue influence over the mind of the testator. He had been out of his house but five or six times during the six months next preceding his death, and Mrs. Hunt was his nurse. He had none of his friends with him, to counteract any influence she might exert, or bear testimony to its existence. It is not pretended that the tendency of Mrs. Hunt's influence was to benefit herself; her object was not to benefit herself, but to injure others. Mrs. Hunt knew that the Abijah Mann will had been executed, and she was dissatisfied with it. The influence which Mrs. Hunt had over the testator, was acknowledged and explained by the testator himself. (2.) Mrs. Hunt was hostile to the grandchildren and daughter-in-law of the testator, and she attempted to, and did exert an influence detrimental to their interests. Mr. Mann says the testator was disposed to listen to " suggestions warning him against any thing." Mrs. Hunt impressed upon his mind, that all his grandchildren wanted, was his money, and he seemed to have a morbid aversion to the bare idea of his property ever going to any other individual. This condition is not consistent with perfect mental sanity.

III. The decedent was laboring under delusions amounting to insanity, and had not a disposing mind, during the prepara-

tion or at the time of the execution of the will. ( *Waring* v. *Waring*, 10 *Jurist. Dew* v. *Clark*, 3 *Addams*, 79.) Proofs of insanity : .The testator speaks of himself as deranged. He received a severe injury in the head the year before his death, and he acted differently after that. The testator's mind presented all the indications which constitute the diagnosis of every case of mania, viz : irritability, capriciousness, credulity, forgetfulness, confusion of ideas, and incapacity to recall to memory the words required to convey his wishes, was easily affected to laughter or tears. The delusions under which the testator labored, amounted to unsoundness of mind. The rule by which to judge of testamentary capacity, is this : "If the mind is unsound on one subject, provided that unsoundness is at all times existing on that subject, it is erroneous to suppose such a man really sound on other subjects." (*Lord Brougham's opinion*, 12 *Jurist*, 947.) (1.) Incapacity to struggle against delusions, constitues unsoundness of mind. (*Ibid. See also* 12 *Jurist*, 925. *Groom* v. *Thomas,* 2 *Hagg.* 434. *Frere* v. *Peacock*, 1 *Rob. Eccl. Rep.* 442.) (2.) It ought not to be concluded, because the connecting link between the impeached act and the so-called monomania is not apparent, that it does not exist.

IV. If, in a case of this character, there is any real doubt as to the testamentary capacity of a testator, "it is proper to reverse the decision of the surrogate for the purpose of having the question of fact settled by the verdict of a jury." This is acting in the spirit of the fundamental law. (*Stewart's Ex'r* v. *Lispenard*, 26 *Wend.* 292 ; *opinion of the Chancellor.*)

V. The disposition of the testator's property was not in accordance with his previously expressed determination.

*Isaac Dayton* and *A. L. Jordan*, for the respondents. I. The absence of the schedule referred to in the clause of the will, printed at fol. 669 of the case, does not impair the validity of the other parts of the instrument, or of its execution. So far as there is any evidence concerning the schedule, it does not appear that it had ever been prepared. The disposition of property

intended by it, could not, therefore, ever take effect. ( *Wilkin-son* v. *Adam,* 1 *Ves. & B.* 445. *Habergham* v. *Vincent,* 2 *Ves. jun.* 204. *The Countess of de Zichy Ferraris, &c.* v. *The Marquis of Hertford,* 3 *Curteis,* 468, *and cases cited.*) The schedule, if it had been executed subsequently to the execution of the will, would have been a codicil to the will, and it would have been necessary to execute it with all the formalities required for the execution of a will. The clause in question, then is only a declaration of a design of the testator to make a schedule-codicil to his will. He published his will after the absence of the schedule was known and remarked. His design to make such a schedule or codicil, for some reason or another, seems to have been frustrated. There is not any pretense that he neglected making this schedule or proceeded to execute his will without it by any misrepresentations, artifice, or undue influence. The testator seems to have been indifferent on the subject. No case can be found where an accident, inadvertence or mistake of this kind has been held to affect the integrity of a will otherwise valid.

II. The contestants, appellants, proposing to impeach the validity of the will, on account of a supposed incapacity of mind in the testator, it was incumbent on them to establish such incapacity by the clearest and most satisfactory proofs. The burthen of proof rests upon the person attempting to invalidate what on its face purports to be a legal act. Sanity must be presumed till the contrary is shown. (2 *Phil. Ev.* 191. 1 *Taylor on Ev.* 126. *Jackson ex dem Van Deusen* v. *Van Deusen,* 5 *John.* 144. *Lessee of Hoge* v. *Fisher,* 1 *Peters,* 163. *Heirs of Lee* v. *Executors of Lee,* 4 *McCord,* 183. *See also Temple* v. *Taylor,* 1 *Hen. & Munf.* 476.)

III. Not only is there a failure of proof on the part of the contestants in this case, to satify the imperative requirement of the law, but on the contrary, the evidence is clear and explicit that the testator, in all his intercourse and relations in life, acted the part of a sound, clear-headed, shrewd and calculating man of business ; that the will in question was the result of long continued and mature premeditation ; that its terms and provis-

Thompson v. Thompson.

ions, and the disposition and distribution of his property proposed by the testator, were all matters by him carefully and rationally considered and determined upon, and that the execution of the will itself was attended by every requisite circumstance of calmness, deliberation, and freedom from restraint. All the witnesses who ever associated with the testator in commercial affairs, or ever had dealings or business transactions with him, are unanimous in their testimony as to his entire business capacity and soundness of mind up to almost the very hour of his death. The testator, by his own industry, shrewdness and enterprise, had amassed a large fortune, and was, at the time of his death, concerned in extensive business engagements, and his capacity for business was unimpaired up to 3 or 4 o'clock of the afternoon of the very day he died. The testimony of Judge Campbell proves the care and premeditation with which the will was prepared, and shows that a disposition of his property, by will, substantially the same as that made by the will in question, had been in the mind of the testator for a long period previous to the execution of this will. The testimony of Dr. Spring shows both a rational resolve to dispose of his property for the benefit of religious and charitable societies, and the considerations which affected his mind to lead him to that purpose. To the like effect is the testimony of the Rev. Mr. Spencer. The testimony of the subscribing witnesses is ample to the rational, deliberate, business-like, and intelligent manner in which the execution and publication of the will were conducted.

IV. The peculiar notions or opinions which the testator entertained, or affected to entertain, in no way diminished the vigor of his mind, or impaired his understanding with respect to the ordinary topics or affairs of life. It does not appear that Kidd's treasures, animal magnetism, divining rods, or the philosopher's stone, at all influenced his religious sentiments, his intercourse with men, his dealings in business, or his affections towards his relatives and family. Insanity cannot be predicated entirely on a matter of faith. Delirium of itself is not insanity : it is only so when it operates so as to affect a man's disposition of his property. In the case of *The Heirs at Law of Mason*

*Lee* v. *The Executors, &c. of Mason Lee,* (4 *McCord,* 183,) the court of appeals of South Carolina held that proof that the imagination of the testator was generally disturbed with a strange belief in witches, devils and evil spirits, which he fancied continually worried him, and that he lived in the strangest manner, wearing an extraordinary dress, sleeping in a hollow log, and exhibiting other extravagances, was not sufficient to invalidate his will, it appearing that the man was able in other respects to manage his affairs. The circumstances of that case were far more extraordinary than those which mark the case now before the court. The testator was such as is above described, and the property was left to two of the states of the Union, to the exclusion of the testator's relatives, but the will was sustained. (*Merdury* v. *Cross,* 3 *Curteis,* 671.)

V. There is not any evidence to sustain any imputation that the will was affected by his singularities.

VI. There is not any evidence of influence exerted to affect his intentions.

VII. The inconsiderable provisions made in the will for the testator's grandchildren, as they do not of themselves render the will invalid, so they do not furnish any legal reason that it should be considered an irrational act. (2 *Black. Com.* 503. *Dew* v. *Clark,* 3 *Add.* 79 ; 2 *Eng. Com. L. Rep.* 436. *Wrench* v. *Murray,* 3 *Curt.* 623. *Heirs of Lee* v. *Executors of Lee,* 4 *McCord,* 183.) Whether the testator's grounds for cutting off his grandchildren are to be approved or not is not the question. It is enough that the influences which operated upon his mind do not indicate insanity or restraint. His will, then, stands as the reason for his act.

VIII. The decree of the surrogate should be affirmed, and with costs to be paid by the appellants.

MITCHELL, P. J. The question whether the testator was of sound mind was so ably examined by the surrogate that it is unnecessary to do much more than refer to his opinion. The testator was perfectly competent to transact business of a very large extent, for himself and as trustee for others, and as a director

Thompson *v.* Thompson.

of several incorporated institutions. His peculiarities of opinion never disturbed his reason. Erroneous, foolish, and even absurd opinions on certain subjects, do not show insanity, when the person entertaining them still continues in the possession of his faculties, discreetly conducting not only his own affairs, but the business also of others. Mr. Thompson gave good, and in the view of many discreet persons very wise, reasons for the provisions made in his will; and there is no proof that he was influenced by any one to dispose of his property as he did.

As we differ from our brother Clerke both as to the conclusions of fact, and as to the law, of this case, it would be proper to state our reasons fully, if the case had not been fully examined by the surrogate, or his opinion not been accessible to all, through his reports.

Using the negative of the language of our associate, we are satisfied as matter of fact, that whether all that any witnesses testified, as to peculiarities of opinion, be true or not, they do not establish, when other evidence is received, unsoundness of mind, or an inability to manage his own affairs, or to dispose of his property according to the suggestions of his own unbiased and unfettered will; that his false opinions did not affect his intellect or affections, or render him incapable of disposing of his property in obedience to the free impulses and motives by which the human mind in its ordinary healthy state is directed, on such occasions; that they did not impair his ability to make prudent investments, or to advise in the affairs of the various companies with which he was connected, nor, we add, to understand and enjoy the doctrines of the religion in which he was educated, and to make them more particularly the guides of his conduct as he approached nearer to the period when all worldly objects would lose their influence, except as they could be used by him to benefit his fellow men; that they did not in the least affect or influence his action in relation to the final disposition of his property, or in relation to any of the prior wills which he had executed; that they did not affect his testamentary capacity, in any degree; that he was not under the influence of

Thompson *v.* Thompson.

any persons, in making the will, and that when he adopted the advice of any one it was because his mind was convinced that such advice was the best, and that he adopted it only so far as his mind was so convinced; that he yielded to such advice only as any other judicious man would do; that he was not subject to any mental aberrations or imbecility that exposed him to undue influence, especially in the disposition of his property; and that no such influence was used in this case.

He assigned reasons why he gave a comparatively small part of his fortune to his relatives, which showed a mind sound in its power of reasoning, whether correct in its conclusion in the particular case or not. It was, in effect, that they would be really more happy with such provision as he made for them, in addition to what they had already, than if he gave them all that he possessed. This was the conviction of one who had commenced life with moderate means, whose experience had shown him that property easily acquired was generally soon lost; and that those who had only enough to enable them to employ their abilities to advantage, were more likely to succeed, even in this world's goods, than those on whom large fortunes devolved without any exertion on their part. Many sound men would approve his reasoning, although they might not have the resolution to carry it out, towards their nearest relatives. To conclude that a young man, or even a married woman, would be more successful and more happy with $50,000 than with $100,000 and more, does not argue insanity.

The decree of the surrogate should be affirmed, with costs.

Cowles, J. A careful examination of the whole case has brought me to the conclusion that the testator was of sound and disposing mind and memory; fully capable of making his last will and testament. And upon that ground I concur with my brother Mitchell in the conclusion at which he has arrived.

Clerke, J., (dissenting.) Mr. Thompson died on the 29th of October, 1851, having, two days previously, executed the instrument in question. He had before executed two wills; the

first on the 31st of August, 1850, by which he left the residue of his estate in trust for his grandson, Edward, during his life, with remainder to his issue, after leaving $10,000 in trust, to his granddaughter, Mrs. Quimby, during life, remainder to her issue, and some small legacies, amounting to $26,500; the second will was executed on the 13th of May, 1851, by which he left $10,000 in legacies to several friends and relatives, $5,000 in trust for Mrs. Quimby, $20,000 in trust for Edward, during life, and *the residue of his estate in trust for numerous benevolent and religious societies.*

By the instrument on which we are now called upon to pass, he left several small legacies to the amount of $15,250; to his granddaughter Mrs. Quimby and her mother $100 each, to Edward $15,000, in trust during life, and the remainder, the great bulk of his estate, to religious and benevolent societies. Mr. Thompson died at the age of seventy-five years, unmarried, leaving property to the amount of about three hundred thousand dollars. His only child, Edward, died in the year 1835, leaving a widow and three children, Augustus, Edward and Cornelia, afterwards Mrs. Quimby. He appointed his father, the decedent, trustee of his estate for the benefit of his family. Augustus died an infant. Edward, still a minor, and Mrs. Quimby remaining his only issue, are the contestants of this will.

The probate was contested on the grounds of—1st, invalid execution; 2d, insufficient testamentary capacity, and 3d, undue influence.

I. It is unnecessary for me to dwell upon the first ground, as I fully concur with the surrogate in his reasoning and conclusions on this point. The absence of the schedule referred to in the clause of the will printed at folio 669 of the case, does not invalidate the execution of the instrument as a whole.

II. Before we proceed to consider the testamentary capacity of the testator, it is expedient to inquire into the character and effect of the decision of the late court for the correction of errors, in *Stewart's Executor* v. *Lispenard*, (26 *Wend.* 255.)

What are the precise principles upon which that decision was based, and how far is this court concluded by them?

If we are to take the opinions of Senators Verplanck and Scott, as certain indications of the grounds upon which the court decided this case, we must admit that the highest court of judicature in this state adopted and announced the rule, that " Courts, in passing upon the validity of a will, do not measure the extent of the understanding of the testator; *if not totally deprived of reason, he is the lawful disposer of his property; and his will stands as a reason for his actions.*"

From the constitution of that court, composed as it was of thirty-two senators, and in equity cases of the justices of the supreme court—in common law cases, the chancellor—the difficulty of ascertaining the exact ground of any adjudication was well understood, and was the cause of much perplexity and uncertainty to the bar, and to the courts of original jurisdiction. Many opinions were often delivered in the same case, and, although the conclusions might have been the same, the reasoning and the propositions, from which those conclusions were deduced, were sometimes dissimilar, and not unfrequently quite repugnant. No opinion was ever officially pronounced as the opinion of the majority of the court. This was felt to be a serious defect in our system, and was one of the many reasons, which influenced the convention of 1846, in recommending the establishment of a new court of appellate jurisdiction.

In *Stewart's Executor* v. *Lispenard,* the only opinions published are those of Senators Verplanck and Scott; so that we are entirely without any means of ascertaining the views of the majority of the court, on the legal principles involved. Mr. Justice Bronson, the only justice of the supreme court, and the only member of any court, present, declined to give any opinion; excusing himself on the ground of want of leisure to examine the authorities cited. He attended solely for the purpose of enabling the court to form a quorum. The president of the senate was in the same predicament; and he, as well as Judge Bronson, declined to vote.

Indeed, it is quite plain to my mind, from the questions pro-

sented to the court, that the discussion involved facts to a much greater extent than legal principles ; and to facts, consequently, the attention of the majority of the court was principally directed. Judge Bronson, in the few remarks delivered by him, said that " the question presented by the appeal, was as to the capacity of the testatrix ; and upon that point there was a conflict of testimony, raising, of course, a question of fact and not of law." Notwithstanding that, the court decided, by a majority of three, against the motion of Judge Bronson, to send the cause back to the circuit, to be tried before a jury on a feigned issue, but insisted forthwith on reversing the decisions of the surrogate, the circuit judge and the chancellor, without further delay or investigation, and ordering that the will be admitted to probate. This course seemed to be inconsistent even with the remark of Senator Verplanck, who said that the whole inquiry was a mixed question of law *and fact ;* therefore, according to the provision of the statute (2 *R. S.* 10, § 57,) it ought to have been sent to a jury.    It is only where the decision of the surrogate is affirmed or reversed upon a *question of law* (solely,) that the proceedings should be remitted to him, with a certificate of the decision of the appellate court.    (2 *R. S.* 505, § 97.)

I am, therefore, inclined to the opinion, that the decision in the Lispenard case has not declared or established, irrefragably, any principles of controlling or indisputable authority, on the subject of testamentary incapacity.    I think we are still free to examine the propositions contained in the opinion of Senator Verplanck, and to inquire whether " the courts in passing upon the validity of a will, do not measure the extent of the understanding of the testator ; and, *if not totally deprived of reason, that his will stands as a reason for his actions."*

This opinion is, probably, in accordance with ancient authority, and with decisions comparatively modern.    According to ancient commentators, the more *general* description of a person, who from his want of reason and understanding comes within the protection of the law, is that of *non compos mentis.*    And *Coke,* in his commentary, on section 405, liber the 3d of the Institutes, where Littleton indicates this principle, says, " *Non compos*

*mentis* is of four sorts; 1st. Idiota, which from his nativitie by a perpetual infirmitie, [I retain the author's orthography,] is *non compos mentis ;* 2d. He that by sicknesse, griefe, or other accident, *wholly* loseth his memorie and understanding ; 3d. A lunatique, that hath sometime his understanding and sometime not ; lastly, he that by his own vitious act depriveth himselfe of his memorie and understanding, as he that is drunken." (A condition, however, giving no privilege or benefit to him or his heirs.) From this classification was evidently excluded any alienation of mind, which did not constitute a person a lunatic, an idiot, or a drunkard. Lord Hardwicke held, that unless the testator suffered from a *total deprivation of reason,* the validity of his will could not be affected ; that is, he must have been either a confirmed idiot or lunatic. Subsequently to Ld. Hardwicke's time, the wisdom of this rule seemed to have been much questioned ; and, within a comparatively recent period, the law has worked itself out of a state of great uncertainty and perplexity on this subject, and has become, in a measure, clear and intelligible. Decisions in England—in the ecclesiastical courts and in courts of equity—as well as the statutes of the legislature, both in that country and in this state, (entirely overlooked by Senators Verplanck and Scott,) have almost simultaneously accomplished this result. The law, for more than twenty-five years, evidently contemplates three, instead of two states of mental alienation—lunacy, idiocy and *unsoundness of mind*—unsoundness of mind being emphatically distinguished from lunacy and idiocy. The revised statutes, when referring to the mental condition necessary for the control or disposition of property, recognize and employ this distinction in numerous instances. The term *unsoundness of mind* is almost invariably employed in those statutes in contradistinction to lunacy or idiocy, or to both, whether in reference to the alienation of real estate, to the proper questions for a jury, under a writ *de lunatico inquirendo,* to the care and custody of the estates of certain persons by the chancellor, or to the disposition of real or personal estate by will ; whereas the old revised laws, which the revised statutes superseded, never use this new

Thompson *v*. Thompson.

term, but confine themselves to the old distinctions of lunacy and idiocy. (*See the first volume of the Revised Laws*, 147, 365, 367.) Then examine the corresponding subject in the revised statutes, (2 *R. S.* 52, *marginal*,) being embraced in a distinct title. It is entitled " Of the custody and disposition of the estates of idiots, lunatics, *and persons of unsound mind*, and drunkards." This distinction is carefully preserved in the text of the sections of this title, 1, 8, 11, 16, 19, 23, 24 and 25, and never departed from in any section. The same term is employed in contradistinction to idiots, in 1 R. S. 719, § 10 marginal, and again 2 R. S. 56 ; the first referring to persons capable of conveying lands, the second to those capable of devising real estate.

It is said that Lord Eldon was the first who gave this term a distinct place among the legal varieties of mental alienation. The distinction is clearly held in *Ridgeway* v. *Darwin*, (8 *Ves. jun.* 67.) Mr. Shelford, in his treatise on the *law of Lunatics*, page 87, in commenting on this opinion, states that it imports that the party is in some such state of mind, *as is contradistinguished from idiocy and lunacy*, and yet such as makes him a proper subject of a commission ; and subsequent decisions are in conformity with this view.

In cases, then, of the description now before us, the question is not merely, was the testator a lunatic, but, if not a lunatic, had he an unsound mind. The terms lunacy, idiocy, and unsoundness of mind, have a fixed and definite meaning. Lunacy, formerly applied, in popular language, only to periodical insanity, is that diseased exaltation of the intellectual or affective powers, or of both, more generally known under the term *mania*. It arises from a morbid affection of the brain, and, like other diseases, is the subject of remedial treatment. To employ the language of an able medical writer on the subject, " Whether proceeding from hereditary predisposition, or maternal influences during gestation, from the cerebral irritation produced by disease in other parts, or by external injuries, from excessive or deficient exercise of the mind, from great predominance or indulgence of some faculties, with a small endowment or neglect

of the rest, from improper or insufficient nourishment or air, from the unbridled license of the passions, or the habitual use of intoxicating drinks, we see the influences of causes precisely analogous to those which give rise to other diseases." (*Ray's Med. Jurisp. of Insanity, p.* 141.) Some maniacs indulge in wild excesses of merriment, some in gloom and taciturnity, some in excessive loquacity, some in fierce and boisterous violence, while some exhibit glimpses of soundness, and no little acuteness and ingenuity ; and others are rational on all subjects except one, and, until affected by that, exhibit the ordinary deportment and sagacity. These latter are *monomaniacs.* This partial insanity is prevalent to a very great extent ; and, if I said to a much greater extent at this, than any former era, I fear that the assertion would be true. I see no other way of accounting for the wide prevalence of whimsical and fantastical opinions, the transcendental speculations, the wild vagaries of faith, the intolerant fanaticism, the rash obtrusion upon regions of knowledge, palpably beyond the limits of the human faculties, the profane contempt manifested by some men, and, alas ! by some women, for all that experience has rendered sure and steadfast, rushing with wild avidity into the espousal of any thing new, because it is new, and substituting the phantoms of a diseased imagination for all that the christian and philosophic world has heretofore regarded as most dear and sacred.

Sir John Nicholl, in *Dew* v. *Clark,* thinks that the true criterion of this partial insanity, or monomania, is *delusion*—a delusion, out of which the patient is incapable of being permanently reasoned. Lunacy, in short, is now synonymous with mania, whether total or partial, permanent or occasional.

It is scarcely necessary, on the present occasion, to dwell on the characteristics of idiocy. It is a congenital obliteration of the chief mental powers, amounting to a great insensibility to external impressions, accompanied by certain physical indications, which can never be misinterpreted ; indications which proclaim the torpor of the faculties within, with as unerring certainty as the rolling eye and staggering gait proclaim the drunkard, or the pallid and hollow cheek the victim of disease.

Thompson *v.* Thompson.

But mere unsoundness of mind does not necessarily imply this complete sterility, or these marked physical indications; and yet, mere imbecility does not answer the legal meaning of unsoundness of mind, unless it amounts to inability to manage one's own affairs, or to dispose of his property according to the suggestions of his unbiased and unfettered will. It is not weakness; it is not dullness; it is not slowness of perception; but unsoundness— an unsoundness materially affecting the intellect and the affections, and rendering the individual incapable of protecting his own interests, or of disposing of his property, in obedience to the free impulses and motives by which the human mind, in its ordinary healthy state, is directed on such occasions. An individual in this unfortunate condition is, of course, at the mercy of any one who, openly or covertly, assumes the control over him; and any acts which he performs, are not the acts of his own will. The law, therefore, will not recognize such acts; it says they are void, because all valid acts must emanate from a free and independent will.

Unsoundness of mind, as contradistinguished from lunacy and idiocy, is mental deficiency, either arising from an obstacle to the development of the faculties supervening in infancy, or from disease, as epilepsy, (a very common cause,) or from the decay of old age, or from grief, or disappointment, or intemperance, or any other cause.

These distinctions being established, let us next inquire whether the decedent betrayed any singularities of conduct or opinion, to warrant the belief that his mind and character were affected by lunacy or unsoundness of mind; as it cannot be pretended that he exhibited any of the symptoms of idiocy.

I will, principally, examine the evidence in relation to his *conduct*, his acts; although I am very far from subscribing to the proposition, that mere speculative errors, however monstrous or absurd, are no proof of mental alienation. A man may peradventure, believe in all the abominations and "wanton rites" of ancient Greece and Rome, and worship in sincerity "fanatic Egypt's wandering gods, disguised in brutish form;" he may hope to obtain salvation, like the poor Hindoo devotee, by stand-

ing for a lifetime on one leg, with the other elevated towards the skies, or by throwing his emaciated or lacerated body under the car of Juggernaut; he may believe in

> " Moloch, horrid king, besmeared with blood
> Of human sacrifice, and parents' tears ;"

he may "turn atheist, as did Eli's sons ;" he may even be a howling dervish, and rave, and gash his naked body, thinking the while he is doing God service; and yet he may not be destitute of the ability to transact the affairs of life, or to dispose suitably of his property. If he is the recipient of an hereditary or a national faith, however irrational or crude, although cramping his moral character, and obstructing its development, or if he is the victim of a specious sophism, with which the perverted ingenuity of a false philosophy too often contrives to beguile "the unstable and the unlearned," his mind may not of necessity be "unsound" in the legal sense. But when we see a man, in direct opposition to the faith and traditions of his country and his fathers, originate or embrace a novel creed, destitute of plausibility, revolting to the plainest dictates of reason and the moral instincts with which the Creator has endowed every one "to profit withal," ignoring the authentic facts of history and the axioms of science, for the whimsical images of a disordered brain, and uttering impious words and wild prophecies, " which with their darkness durst affront God's light ;" in such a case it may well be doubted, whether speculative errors are no proof of mental alienation. Are the unhappy persons who have been, for the last fifteen years, every spring expecting the .end of the world, appareled in their robes ready to ascend into the air, and disposing of all their worldly goods—reducing their families to destitution—are such of sound mind? and yet it was speculative error that produced this mischief, and made many of them fit inmates of mad-houses. All the monstrous deviations and crudities which seem to infest us on every side, are in a greater or less degree, I have no doubt, *all of them,* traceable to an abnormal condition of the mental organism.

But it is probably sufficient in this case to examine the *con-*

*duct* and *acts* of the decedent, to ascertain if he possessed testamentary capacity at the time he executed the will in question.

e will first take Solomon Davis, who at the time he gave his testimony was seventy-two years of age, and had resided with Mr. Thompson, twenty-three years previously, for nearly two years, and had lived altogether with him sixteen times, "off and on." After saying that he was a man of curious habits and curious ways, which he could not exactly express, and specifying some instances, he proceeds to say that after he was with him about a year "he gave him a book to read, called Francis Barrett, a book to work spells, cure fever and ague and raise spirits. He then said he knew a place at Montauk where Kidd's money was buried; that he had been on there with an old man he took up, and had a rod that would attract to the money. That he got a man at Sag Harbor named David Mulford. He acted as a rodsman. It did not work well in the old man's hands, *because Mulford had more of the water of life in him.* I asked him why Mulford had more than other men; whether it was because he was a bigger man; because of his size. He said no; *it was because he drank more rum.* He said Mulford took the rod in his hands and it worked well, and he found where the deposit was; struck a crowbar in it and it sounded; formed his ring and commenced digging. Just as he broke the turf there was a great black and white spotted bull came running over the hill, throwing his tail as if he had the wattles in his back in the spring of the year. The bull pawed and hooked the dirt as if he was mad. There were nearly a thousand cattle, he said, that came and passed diagonally over another hill opposite, which acted just like that bull. *He said the bull looked to him as big as a mountain.*" He mentions another circumstance that occurred after Mr. Thompson removed from Beekman to William street, about 21 years ago. "He told me to go to the stable and get a wrench to take his plate off the door. I came in the back way through the basement, up the back stairs into the hall, and met him about halfway, and he took the wrench out of my hands to unscrew the plate. I turned and had just got down the stairs a

bit, when I heard him screech out as if something had hurt him. I ran to his assistance, and he was lying partly on the floor, the wrench in one hand and holding himself up with the other. He said when he began to unscrew the plate *some very strong thing hugged him; it must have been a ghost; it gave him a squeeze like a bear.* I took him down, led him to the William street house, and he said the Beekman street house was haunted, and he would never go into it again for all New York." He then mentions some very strange conduct relative to a pair of horses, which he had commissioned him to buy, and which he had brought home and put in the stable; but in consequence of a dream of Mrs. Hunt, who 'he said always dreamed right, he exchanged those horses with a man named Post, took an old horse for the span, and *gave* $50 *to boot.* The horse was not worth ten dollars, for a gentleman. *The witness had just given* $180 *for the pair, and it had cost him* $50 *to get them here. They were worth* $400 *in New York.* He never rode after them. He sold them to Post the same day of the conversation relative to the dream. This witness tells us of conversations about the philosopher's stone; " that he must line a room with white Irish linen to get that, and must get a man in there, *and keep him drunk six months on strong beer, or London porter, which was better;* at the end of six months, *that man's urine would be the water of life,* and he could complete the philosopher's stone, and with that he could know what every person was about in the earth, under the earth, and in Heaven. He said this a great many times." He proceeds with further testimony on this subject, and that he had told him he had once fixed a room with Irish linen, and put Dr. Clapp in it to talk with the spirits, to get the ingredients for the philosopher's stone. He said he had forty wax candles to burn in the room, while the operator was at work. It cost a good deal. He never told him where the room was. "I don't know that he had a room fixed up any where." He then testifies what Mr. Thompson had told him about Jemmy Dubois' girls seeing treasures in the earth by looking in glasses, and about stones that they see in. The witness drove him to

Thompson *v.* Thompson.

Dubois' when he lived in Greenwich, a good many times. "The girls looked in glasses for him, trying to see treasures in the earth, minerals and mines. I heard him say to them he wanted them to look in the glass to see if they saw a deposit of money in Red Hook. They said they saw it. He said he would go some time and get it." He tells us about being sent by Mr. Thompson to Philadelphia for a man named James Raines to come on here, and make him a mineral needle. He details his conduct in trying to operate with this needle in attracting gold and silver under ground, and his frequent applications and visits to Mrs. Andrews, a clairvoyant in Bleecker street. He undertook often to show this witness spirits in the moon and sky; "and I would often pretend to see them, to get rid of him. *He said they were spirits of the air; some lived in the moon and some in the sky. He would point and say, there don't you see them?* and I would say I did not know but I saw them, to get rid of him the easiest way I could." "He said he had a paralytic fit, years ago, which made him shake his head."

Mrs. Sarah P. Mather details long conversations with him about Kidd's money, treasures under the earth, and enchantments. He said, talking of the philosopher's stone, that "he had set apart a house, and a man consecrated to the work; every thing about it was consecrated; the room was carpeted, and lined with Irish linen. He kept wax candles for forty days and nights; they must not go out. I inquired why forty days? His answer was, that Moses was in the mountains forty days; our Savior fasted forty days. He said that the man whom he had set apart, and consecrated to raise spirits and get the philosopher's stone, and other purposes, must not eat while the sun was up. He could only eat before sunrise and after sunset; and then must eat only unleavened bread, or Boston crackers, &c." "Perfumes were kept burning in the room and the man was dressed in white Irish linen. His object was not only to obtain the philosopher's stone, but also to call in the planetary spirits, whom he could command, and who would obey whatever he said." She proceeds with many

other instances of this species of delusion. Again, " once in the summer, after he had been sick, a year ago last summer, he told me because he had burst asunder the bonds of human nature, and explored the spirit world, that the spirits tormented him when he was sick—were all around him, and were paying him off for what he had done." " He said every body had three eyes, one spiritual and two temporal." " He told me he had been hurt by a horse." " He said it had hurt his head seriously. He had suffered a good deal of pain, but he would get over it, and live nearly a thousand years." Kinney, Cuthbut, Gold, and his lawyer, Mr. Mann, furnish us with proof of a mind eccentric, capricious, causelessly irritable, and helplessly confused when excited by prejudice or delusion.

On the other hand, we have the testimony of his physician, Judge Campbell, Mr. Strong, and many others, some of them fellow directors in money corporations, who unhesitatingly testify to his sagacity, good judgment, and ability to transact the affairs of life judiciously. But this is perfectly consistent with the idea that the decedent may, nevertheless, have been the victim of monomania. In fact it is necessarily within the definition of that state of mind. The delirium is confined to one object. The sufferers are pursued day and night by the same ideas and affections, and they give themselves up to them with profound ardor and devotion. They often appear reasonable, when conversing on subjects beyond the sphere of their delusion. It is highly probable, indeed, that the delusions under which Mr. Thompson labored did not impair his ability to make prudent investments, or to advise on the affairs of the companies with which he was connected. But can we therefore say that they did not affect or influence his action in relation to the final disposition of his property—an act very different from the cold calculations of business, calling forth the exercise of the emotions, perhaps reviving prejudices and mistakes, and begetting excitement, capable of overruling the better affections of his nature and the promptings of his unclouded reason.

It is a mistaken view, and reversing the proper mode of considering this subject, to say that the testimony in favor of his

sagacity and judiciousness as a business man, should prevail over that which shows, indisputably, that he labored under delusions for many years—delusions which seemed to increase with the increase of infirmity and age. The true question is, notwithstanding his sagacity and prudence in business, did those delusions affect his testamentary capacity, either as the result of partial lunacy or unsoundness of mind ?

III. Should it, however, appear that those delusions did not of themselves impair his testamentary capacity, either as the result of partial lunacy or unsoundness of mind, still can it be doubted that he was subject to frequent aberrations of mind, which left him very much to the mercy of designing persons, and exposed him to undue influence. He had paralysis some twenty years before his death; frequent fits of epilepsy three or four years, and received a severe kick in the head from a horse, about two years before that event. To say the least, the change in his intentions from August 31, 1850, when he left the great bulk of his estate to his grandson Edward, to his disposition of it on the 13th of May, 1851, when he left him only $20,000 for life; again, the further change, on the 27th of October, 1851, when he left him only $15,000 for life, and executed the will now in controversy, savor of capriciousness, and do not appear to have been incited by adequate motives operating on his unbiased will. That grandson and his sister were his only lineal descendants, the children of his deceased and only son, whose premature death he bitterly deplored, and whom he promised, at his dying hour, to be a father to his children, and to leave them all his property. What did these children ever do to forfeit his regard, or to induce him to violate this most solemn and affecting obligation?

I think, therefore, if we cannot conclude that he was laboring under lunacy or unsoundness of mind, in the strict legal sense of that term, that he was the subject of mental aberrations or imbecility which exposed him to undue influence. Indeed epilepsy is well known to produce this state of mind; and Lord Eldon expressly recognizes it as one of the causes even of unsoundness of mind. In Senator Verplanck's opinion in the *Lis-*

*penard* case, he admits that "whilst folly or strange particular aberration of opinion, in a mind otherwise unclouded, is alone incompetent to affect the legality of an act of such a person, yet that evidence, when taken in connection with the disposition of the property, the interests and relative situation of those affected by it, and other circumstances, may show conclusively, that this particular act of a person laboring under no general disability, wanted his consenting will and understanding; that the sound and disposing mind was deficient in regard to this special matter; that the whole was the result of fraud, and of abuse of confidence, perhaps of delusion."

On the whole, then, I am of opinion that the decision of the surrogate should be reversed, with costs; and as the statute in such cases absolutely and positively requires, that the case should be sent to the circuit to be tried by a jury; to inquire on the principles stated in this opinion, 1st, whether the decedent had sufficient testamentary capacity, and 2d, if they should answer the first question in the affirmative, was he the subject of undue influence, and was it exercised over him, in relation to the disposition which he made of his property by the will in question?

Decree affirmed.

[New York General Term, November 5, 1855. *Mitchell, Clerke* and *Cowles,* Justices.]