ALBANY COUNTY. — HON. FRANCIS H. WOODS, SURROGATE.—February, 1888.

MATTER OF VEDDER.

*In the matter of the probate of the will of* ELIZA ANN VEDDER, *deceased.*

The doctrine of Delafield v. Parish (25 *N. Y.*, 9) upon the subject of testamentary capacity—explained as deciding that every man is presumed to be *compos mentis,* and the burden of proof rests upon the party alleging an unnatural condition of mind to have existed in the testator.

The policy of the law embodied in Code Civ. Pro., § 829, whereby, in a probate proceeding, the husband of testatrix, being proponent of the will, was rendered incompetent to testify concerning communications with decedent, upon an issue as to testamentary capacity—declared a hoary superstition.

Where an insane delusion is proved, the testator's mental capacity is to be measured by the relations of the delusion to the testamentary act.

Upon an application for the admission to probate of the will of decedent, a married woman, executed about two and a half years before her

death, which occurred at the advanced age of seventy-seven years, it was shown that her physical powers had been gradually failing; that she was miserly in disposition, and, at times, uncleanly in her habits; that, during the last quarter of a century, she had been a believer in witchcraft, frequently talked of buried treasures, had seen the headless horseman, gave absurd recipes and advice to others; pretended to have had personal interviews with the deity and the evil one, to have entered heaven and conversed with its inhabitants; and expressed a desire to be robed like the angels when she died:—While, on the other hand, it appeared that she was prudent and sensible in the management of her household affiairs, shrewd at a bargain, a consistent church member, interested in religious work, and an affectionate wife; that the dispositions of her will were in accord with natural claims upon her bounty, and that, as the subscribing witnesses testified, she was rational at the time of execution.—

*Held,* that the petition for probate should be granted.

Van Guysling v. Van Kuren, 35 *N. Y.,* 70—compared; Morse v. Scott, 4 *Dem.,* 507—distinguished.

APPLICATION for probate of will. The facts are stated in the opinion.

JOHN T. McDONOUGH, *for proponent;* EDWIN COUNTRYMAN, *of counsel.*

H. T. SANFORD, *for contestant ;* EUGENE BURLINGAME, *of counsel.*

THE SURROGATE.—This is a proceeding for the probate of a paper purporting to be the last will of Eliza Ann Vedder. By this instrument, all the property of decedent is devised and bequeathed to her husband, the proponent here, except a legacy of $100, given to Eliza Sicker, her niece and namesake. The nephews and nieces of decedent oppose the probate on the grounds that the will offered was not the free, voluntary and unconstrained act of Mrs. Vedder, that it was not subscribed, published and attested by her as required by law, and that she was not of sound mind, memory and understanding.

The testatrix died January 19th, 1887, at the town of Watervliet, aged about seventy-seven years. Her married life covered a period of twenty-seven years, during which she and her husband lived contentedly on the farm of eighty acres which they owned in common. There was no issue of the marriage. The proponent is about fifty-seven years old. The will in question was executed in August, 1883, at their house. At the same time and place, Mr. Vedder, the proponent, made and executed a will, whereby he gave all his property to his wife, the testatrix here. Both wills were drawn by the same draftsman, who was not a lawyer, but a neighbor and friend of this aged couple. The same subscribing witnesses attested each of these wills.

I am satisfied from the evidence, beyond a doubt, that the will in question was executed, published and attested according to law, and that it was the free and unconstrained act of Eliza Ann Vedder. Undue influence is not shown to have been exercised. The value of the property of each was about equal, and the disparity in ages was not so great as to seriously disturb the proportion of interests. The influence which the law condemns is that which is exercised by coercion, fraud and imposition, and not such as arises from gratitude, affection or esteem. Undue influence must amount to the moral coercion, which restrains independent action, and destroys free will and agency, and the burden of proof is on the party alleging it (Matter of Martin, 98 *N. Y.*, 193). The most serious question I have had to consider is that of the testamentary capacity of this testatrix. The testimony

bearing thereon is very voluminous, covering five hundred type-written pages. Among the principal facts proved by the contestants, are the following: That the testatrix was very old and in a gradually failing physical condition; that she frequently talked to her neighbors about buried treasure, and how to find it; that she put irons in the cream, and marked the bottom of the churn with the sign of the cross, to make the butter come; that she said she could not keep her horses fat because the witches rode them at night; that she was close-fisted and miserly in her disposition and, at times, uncleanly in her way of eating and slovenly in her apparel; that she refused to buy necessary under-clothing for a sick sister; that she said she had conversed with Jesus, and had seen the evil one; that she believed in witches and witchcraft, that she told a neighbor, that she had seen a headless horseman riding across her field; that she told another neighbor that her crying child was bewitched, and that if she would search its pillow she would find a hard bunch of feathers therein, which was the witch, and that she should boil this bunch at night in a pot, and that at midnight she would hear some one knock,—that she should not answer, and in the morning the body of the witch would be found outside the door; that she said she had seen lights over certain spots on the farm, and, that, if a person would dig there at midnight, he would find money there; that she told a certain woman to put live coals and a red garter under her churn, and that the butter would come; that she had talked with a fortune-teller, who told her of the buried money; that she

once said, at Schenectady, that she had seen the Lord Jesus, with a sword, and the angels about him; that she said she had seen a ball of light in the air, with the reflection of soldiers marching, and that the heavens became red as blood when the lights disappeared; that, once upon a time, she took her nephew (a contestant) to dig for gold on her farm, and had him carry a red rooster under his arm for good luck (as I suppose), and that they dug, and got no gold; that she said it was wicked for her to mourn for her deceased sister, because she had seen her in a vision and been told by her not to mourn; that she said she had been to heaven in visions and conversed with people there; that she said she desired to be robed like the angels when she died; that all these strange things were said and done by her during the last quarter of a century of her life: and the witnesses who testify of these things believe she was irrational because of them, although some of them say that in her ordinary affairs she was not a foolish woman.

On the other hand, the proponent proved that, in the performance of her household duties and farm business, the testatrix was a prudent, sensible woman; that, since her marriage, she had successfully looked after the financial affairs of herself, and to some extent those of her husband; that she kept her house neat and clean; that, within a few years before her death, she was a party to an agreement to let the farm on shares, and that she gave wise directions as to how it should be worked; that she went to market frequently, and made good sales of her farm products, and made sharp bargains for necessary supplies; that

she was a life-long member of the Reformed Dutch Church in her neighborhood, and attended services regularly until the last two or three years of her life, when she was disabled by rheumatism and other bodily infirmity; that she labored to bring her husband into membership; that she was greatly interested in church work; that she frequently read her Bible and prayed with her pastor; that her married life was happy and peaceful, and that respectful and affectionate relations existed between her husband and herself; that a belief in visions was a part of her religious faith; that she believed she had sent several persons to heaven by converting them; that she held Christ as her Saviour, and believed in a real communion with him through prayer; that she had an intense way of expressing her religious experience; that many of her expressions were borrowed from the Bible; that she accepted the sacred scriptures as the inspired word of God; that she believed in their inspiration as declared in the creed of the Reformed Dutch Church: and the witnesses who testify to these things believe her to have been rational. The subscribing witnesses are clear and emphatic in their belief and opinion, that the testatrix was of sound mind and memory when she executed the will.

By force of a hoary superstition of the law, embodied in the statutes, the husband and next of kin, who knew her best, were not permitted to testify, as to the personal transactions or communications with her. It does not appear that there was any unfriendly feeling between testatrix and her contesting kinsfolk.

There is no evidence whatever to show that any or

all of these beliefs, delusions, eccentricities or peculiarities, had the slightest connection with or influence upon her testamentary act here in question. There was one medical witness sworn on each side, who had never personally known or seen the testatrix, and who answered hypothetical questions made up from the testimony. Of course the medical testimony is quite evenly balanced, and has no decisive weight either way (Ferguson v. Hubbell, 97 *N. Y.*, 513, 514).

The statutes declare that all persons except idiots, persons of unsound mind and infants, may devise real estate, and that persons of a certain age, of sound mind and memory, may bequeath personal property. The courts have held that, under these provisions of law, all that is required is, that, at the time of making a will, the testator shall have sufficient capacity to comprehend the condition of his property, and his relations to the persons who are or might have been the objects of his bounty, and the scope and bearing of the provisions of his will (Van Guysling v. Van Kuren, 35 *N. Y.*, 70). There is no presumption against a will, because made by a person of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body (Horn v. Pullman, 72 *N. Y.*, 269–276). The criterion as to mental capacity, in all who are not idiots or lunatics, rests on the determination whether the testating party was *compos mentis*, or *non compos mentis*, as those terms are used in their fixed legal meaning. The person propounding a will must prove the mental capacity of the testator, but at common-law, and under our statutes, as defined by the highest authority, the legal presump-

tion is that every man is *compos mentis*, and the
burden of proof that he is not so rests upon the party
who alleges that an unnatural condition of mind ex-
isted in the testator (Delafield v. Parish, 25 *N. Y.*, 9).

The doctrine, that *any* insane delusion incapacitates
from making a will, is not followed in this State.
The rule here seems to be well settled, that mental
capacity is to be measured by its relations to the
testamentary act. It has, therefore, been held that a
person having any insane delusion relating to the
property, the persons concerned, or the provisions of
the will, is incapable; while delusions which in no
way relate to these do not, as a matter of law, inca-
pacitate, for they involve no more likelihood of actual
incapacity than many other latent causes. Thus, in
Van Guysling v. Van Kuren (35 *N. Y.*, 70), the facts in
many respects resembled those proved in the case at bar.
There, it appeared that the testatrix believed she was
tormented by witches and spooks, which kept her awake
at nights, and became enraged at those who told her
there were no witches; that she imagined she saw
things which did not exist; that she described visions
she had while sleeping; that she talked disconnectedly
and was forgetful; that, on one occasion, she directed
a person to buy two pounds of pork, and gave him
only two cents to buy it with, when the price was
eight cents; that she used her fingers instead of a
knife and fork; that her eyes were frequently wild
and·glaring, and yet the Court of Appeals held she
was of disposing mind and memory.

In Thompson v. Quimby (2 *Bradf*, 449; 21 *Barb.*,
107), the testator believed that he had found the place

where Captain Kidd's treasure was buried, and he was only prevented from getting it by broken spells; that he had been hugged by a ghost; his housekeeper having dreamed that his pair of horses, which cost $250, would run away and kill him, he exchanged them the next day for a horse not worth ten dollars; that he had the recipe to make the philosopher's stone; that there were spirits in the air; that spirits tormented him in sickness, and that he had seen the evil one in the shape of a bull. The learned Surrogate BRADFORD reached the conclusion that the credulity, superstition and absurd belief in the supernatural are not, *per se,* indications of insanity, and he probated the will. The General Term confirmed his decision, and held that " erroneous, foolish and even absurd opinions on certain subjects do not show insanity, when the person entertaining them still continues in the possession of his faculties, discreetly conducting not only his own affairs, but the business of others." In Forman's will (54 *Barb.,* 274, 297), it was said that a monomaniac or a partially insane person may make a will. A believer in witches and witchcraft, in spiritualism, or in the doctrines of Mahomet, may make a will. In Bonard's case (16 *Abb., N. S.,* 128, 182), the deceased was a believer in the doctrine of metempsychosis, and gave his entire estate of $50,000 to the Society for the Prevention of Cruelty to Animals, and his will was sustained.

In Coit v. Patchen (77 *N. Y.,* 533), the will was contested, and delusions alleged as to the conduct and affection of testatrix's husband, and as to the want of affection for her on the part of some of her children;

among others, that they desired to confine her in an asylum, whereby she was led to discriminate against them. The testatrix was a strong-minded woman. She had had a severe sickness some years before making her will; she continued thereafter, however, to manage and control her business, to collect her rents and make improvements. She conversed intelligently. No act of insanity or improvidence as to her business affairs was shown. She was passionately jealous of her husband, and quarreled with him frequently. The children discriminated against sided with the husband, and those favored sided with the mother. Lunacy proceedings were instituted and then stopped by the husband. It was held, that the evidence failed to show any insane delusions, such as rendered testatrix incompetent to make a will. In Children's Aid Society v. Loveridge (70 *N. Y.*, 387), it was held that the fact that an aged person is forgetful, and at times labors under slight delusions, does not, *per se*, establish testamentary incapacity.

The learned counsel for proponent have called my attention to many cases in other States, holding substantially the doctrine laid down in the foregoing cases. Thus, in Addington v. Wilson (5 *Ind.*, 137), the testator believed in witches, and that his wife and daughters were bewitched. In Kelly v. Miller (39 *Miss.*, 17), the testator believed in witches and conjurors; that his mother was bewitched; that his horse and gun were bewitched; and that when he broke bread at table it turned into blood. In Lee v. Lee (4 *McCord* [*S. C.*], 183), the testator believed that all women were bewitched, and he could not sleep on

a bed made by a woman. In Robinson v. Adams (62 *Maine*, 369), the testatrix was a spiritualist who believed that her son-in-law was under the control of an evil spirit; she kept books of spiritual communications which she considered of great value, and declared that the spirit of her deceased husband directed the terms of the will. In Brown v. Ward (53 *Maryland*, 377), the testatrix was a spiritualist who was of belief that she communed with spirits, could cure the sick, and foretell future events. In Smith's will (52 *Wis.*, 543), the testator was a spiritualist, and claimed to have received a message from his deceased wife, telling him to marry the appellant, beneficiary, and he frequently consulted mediums about his business and proposed investments. In all these cases, the wills were sustained by the highest tribunals.

The learned counsel for contestant strongly urge, among many others, the case of Morse v. Scott (4 *Dem.*, 507), and Benedict v. Cooper (3 *Dem.*, 362), as favoring their contention. The latter was not for a probate, but to revoke a probate, and has little, if any, bearing on the question involved here. The former case, however, does bear on the question. The testator was an ignorant man, weak and superstitious; he had delusions on various subjects; he built a vault and purchased a metallic coffin, which he said would preserve his body to all time; he gave public notice that he would die on a certain day, and two hundred people gathered about the house to witness the event; he was boisterous, profane and often indecent in his language; he erected tombstones over two buried horses, and bought coffins for his dog and cat;

he made a number of wills, in all of which some pro-
vision was made for perpetually maintaining his vault.
By the will offered for probate, he disinherited his
next of kin, and gave his property to a Church-Society,
not to advance the cause of religion, but, as he said,
for the purpose of having his vault preserved to the
end of time; and he declined to make his relatives
trustees because they could not live to the end of time
to care for his body, which was to be preserved forever.
The learned Surrogate held that the will was the *re-
sult* of an insane delusion, which controlled his judg-
ment and misled his understanding in relation to the
subject upon which it was acting, and was therefore
invalid.    This case differs from almost all of the cases
above cited in courts of this State, in that, while in
those cases the delusions did not enter into or affect
the will, and did not influence the mind in making the
disposition of the property, in this case the will was
the very outgrowth of the delusion.

There is no evidence as to this will of Eliza Ann
Vedder, to bring it within the doctrine laid down in
Morse v. Scott, or in Seaman's Friend Society v. Hop-
per (33 *N. Y.*, 619), or the very recent case of Keeler
(12 *N. Y. State Rep.*, 148), all of which were decided
upon the ground that the delusion affected the testa-
mentary act.    Mrs. Vedder's will comes within the
decision made in Van Guysling v. Van Kuren (*supra*).
It was not, under the circumstances, an unnatural or
improper will for her to make.    For a quarter of a
century she and her husband, the beneficiary, lived
happily together, owning and holding their property
as tenants in common.    They had no children.    Evi-

dently, they determined that whichever survived would take the whole property; so they made mutual wills. The testatrix had the right to dispose of her property as she saw fit. She was under no obligation to provide for nephews or nieces. Her will is entirely unconnected with and uninfluenced by the delusions with which she was affected. It is not the result of any particular delusion or any combination of delusions nor does it appear that she was influenced in making it by the peculiar views she held. In fine, there is nothing in the case which shows that she had any delusions in regard to her nephews, nieces, her property, or the disposition thereof. As we have seen, a belief in spiritualism, paganism, or demonism does not necessarily disqualify one from disposing of property by will.

As to the belief in witchcraft, the learned counsel for proponent, Judge COUNTRYMAN, has enriched his brief with rare and curious learning, and in the light derived from it, and from the entire testimony, we may more perfectly understand the mental condition of this quaint old lady, Mrs. Vedder, who, sensible and prudent in her daily walks and conversation, and performing her duties and filling her station with at least the fairly average intelligence of people of her condition, yet had many of the strange beliefs and superstitions which were prevalent two or three centuries ago, and which are largely overthrown and discarded in our day. Scarcely two centuries ago, the great body of Christians believed in witchcraft, and, under the solemn sanction of the law, hundreds of poor old ladies, condemned as witches, were tortured and died

amidst the blazing faggots.   It is said that, during the Long Parliament, hundreds were even thus put to death in England.   The lurid light of these judicial fires is spread on the pages of American history. Commanding intellects—Coke, the mighty Bacon, wise Sir Matthew Hale, Martin Luther, John Wesley, Cotton Mather, believed in witchcraft.

Profound theologians contended that a disbelief in it was rank heresy, and they. cited Scripture to their purpose : " Thou shalt not suffer a witch to live " (Exodus, xxii., 18).   " A man or a woman that hath a familiar spirit, or that is a wizard shall surely be put to death" (Leviticus, xx., 27).   " Saul, during his reign put away those that had familiar spirits and the wizard out of the land" (Sam., xxviii., 9).   St. Paul says, witchcraft, like idolatry and heresy, adultery and drunkenness, is a work of the flesh, and no one who practices it shall inherit the kingdom of God (Ep. Galat., v. 19, 21).   When the prophets failed to answer Saul what he should do, he inquired of the witch who lived at Endor . . . . She said she brought up Samuel from the grave to answer the King (1 Sam., xxviii., 15).   Manasseh, the son of Hezekiah, " did that which is evil in the sight of the Lord, for he used enchantments, and used witchcraft, and dealt with familiar spirits and with wizards " (2 Kings, xxi., 6).

The Bible was the book of books to the aged testatrix.   Its lessons had sunk deep in her heart, its language was often on her lips, it was to her the precious fountain of God's inspiration.   It is not passing strange, that the ancient belief in witchcraft survived in her, and found expression and action as has been recorded.

I am persuaded that her beliefs, peculiar and strange in many respects, in the clearer light of to-day, did not disqualify her from disposing of her property by will, and I accordingly hold that she was *compos mentis*, and that the paper propounded as her will should be admitted to probate.